
FILED
IN OPEN COURT

SEP - 9

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:15cr264 |
| | ) | |
| EDWIN KEITH McMEANS, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The United States and the defendant, EDWIN KEITH McMEANS, stipulate that the allegations in the one-count Criminal Information and the following facts are true and correct. The United States and McMEANS further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt:

### BACKGROUND

1. At all relevant times, Company K was a government contracting company located within the Eastern District of Virginia. At all relevant times, the defendant, EDWIN KEITH McMEANS, was a principal and co-owner of Company K.

2. In or about April 2008, McMEANS and other Company K principals established Company T. Company T was also located within the Eastern District of Virginia and shared office space with Company K. McMEANS was a principal and co-owner of Company T from its inception, and also served as Company T's general manager.

3. Prior to the formation of Company T, Company K provided information technology ("IT") services and goods to the government. After the formation of Company T, Company K focused on providing IT services, while Company T focused on sales of IT goods.

4. Companies K and T certified themselves to be Service Disabled Veteran Owned Small Businesses ("SDVOSBs"). Pursuant to federal law, SDVOSBs received preferential consideration in certain federal government contracts.

5. Company F was another IT contractor located within the Eastern District of Virginia. Company F was not related to Companies K or T. Company F also certified itself to be an SDVOSB.

6. Except where authorized under a "sole source" contract proposal, federal government contracts generally could be awarded only upon the submission and consideration of bids, or best price quotes, from more than one company. In general, the requirement to obtain multiple bids applied both to open market government contracts and to those that had been set aside for SDVOSBs.

7. Companies wanting to bid on and be awarded federal contracts governed by the Federal Acquisition Regulations ("FAR") were required to register in the Central Contractor Registry ("CCR") and in the Online Representations and Certifications Application ("ORCA"). In 2012, CCR and ORCA were combined into an application called System for Award Management. Formal certification of ORCA data occurs when a vendor signs a solicitation. At that time a vendor is certifying that data in ORCA is current, accurate, and complete.

8. Pursuant to the FAR, bids on government contracts submitted by Companies K and T incorporated a "Certificate of Independent Price Determination." This certificate stated, in pertinent part:

(a) The offeror certifies that—
   (1) The prices in this offer have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to—
      (i) Those prices;
      (ii) The intention to submit an offer; or
      (iii) The methods or factors used to calculate the prices offered.
   (2) The prices in this offer have not been and will not be knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening (in the case of a sealed bid solicitation) or contract award (in the case of a negotiated solicitation) unless otherwise required by law; and
   (3) No attempt has been made or will be made by the offeror to induce any other concern to submit or not to submit an offer for the purpose of restricting competition.

FAR Subpart 52.203-2.

9. As general manager, McMEANS authorized Certificates of Independent Price Determination to be submitted to the government on behalf of Company T.

## THE CONSPIRACY

10. Starting on or about March 2007 and continuing until in or about November 2012, McMEANS conspired with others to obtain federal government contracts through false pretenses and representations.

## THE MANNER AND MEANS

*Loser Bid Practice*

11. McMEANS submitted, and allowed employees of Companies K and T to submit, bids provided to Company T by nominal competitors, such as Company F, that were higher than the bids submitted by Company F. McMEANS also allowed employees of Companies K and T to create bids on behalf of nominal competitors, such as Company F, that were higher than the bids submitted by Companies K and T. These inflated bids included the nominal competitor's corporate logo and other identifying corporate information, along with line items detailing descriptions, quantities, and pricing. An inflated bid prepared by an employee of one company

3

on behalf of another company, for submission to the government by that other company was commonly referred to by employees of the companies as a "3rd bid." This Statement of Facts will refer to such bids as "loser bids."

12. McMEANS understood that a loser bid was not a true competing bid, that it was not intended to win the contract, and that it would have the effect of providing the necessary number of bids so that the intended winning bid could be awarded a contract when the required number of competing bids had not been submitted.

13. McMEANS and his co-conspirators intended to financially benefit each other by repeating the loser bid practice over a series of federal contracting opportunities, thereby increasing the chances that their companies would win.

*Agreements with Government Actors and Improper Access to Procurement Process*

14. McMEANS and his co-conspirators caused Company T to make unlawful payments to other co-conspirators who were working within the government.

15. Company K and T employee A.B., acting at times with the knowledge and approval of McMEANS, drafted portions of internal government procurement documents related to procurements that Companies K and T intended to win and obtained other internal documents related to such procurements from co-conspirators working within the government.

OVERT ACTS

In furtherance of the conspiracy and to achieve the objects and purposes thereof, McMEANS and/or his co-conspirators committed and caused to be committed the following overt acts, among others, in the Eastern District of Virginia and elsewhere:

### Early Loser Bids Involving Companies K and F

16. In or about March 2007, Company K principals introduced Company K employee A.B. to Company F employee T.F., and instructed A.B. to engage in the loser bid practice with T.F. Pursuant to this instruction, A.B. and T.F. submitted multiple loser bids on behalf of Companies K and F.

17. On or about November 2, 2007, while A.B. was out of the office and unavailable to submit loser bids, McMEANS submitted a loser bid on behalf of Company K at T.F.'s request on a contract opportunity with the U.S. Army.

18. On or about November 28, 2007, while A.B. was out of the office and unavailable to submit loser bids, McMEANS again submitted a loser bid on behalf of Company K at T.F.'s request on a contract opportunity with the U.S. Army.

### Project Scorpion

19. On or about December 18, 2007, M.R., a contracting officer's technical representative within the Department of Homeland Security, Customs and Border Protection ("CBP"), told A.B. that CBP had "$3 million dollars to spend . . . on expanding [M.R.'s] team," that M.R. was "looking for 5 to 10 more bodies," and that he would "do this as an SDVOSB set aside." M.R. also informed A.B. that he wanted two current CBP contractors, C.E. and A.R., to be a part of this services contract.

20. On or about December 19, 2007, A.B. disclosed the information described in Paragraph 19 to McMEANS and described the opportunity, which Company K labeled "Project Scorpion," as "A must WIN!"

21. On or about January 6, 2008, A.B. drafted a CBP Market Research document for Project Scorpion and e-mailed it to McMEANS. In the body of the e-mail, A.B. stated:

> Here's a bs template I put together on how I envisioned a market research document to look that will supplement the [statement of work] and acquisition planning doc. Obviously I want to make it thorough enough with some kind of evaluation criteria and scoring so that procurement will give the thumbs up. We need to determine what other SDVOB's we want to reference in this doc and I will fill out the rest tomorrow.

22. On or about January 8, 2008, A.B. sent an e-mail to McMEANS and a Company K employee titled "Market Research doc almost complete. Keith, I still need info from you." In the body of the e-mail, A.B. wrote that he had assigned Company K a score of 100 percent in the market research document, and asked McMEANS to provide additional content for the document.

23. On or about January 8, 2008, A.B. sent an e-mail titled "Scorpion Docs" to C.E. and A.R. A.B. copied McMEANS on the e-mail. Attached to the e-mail was a package of ghostwritten CBP procurement documents, including a cover letter in M.R.'s name, an acquisition plan, a statement of work, and a key personnel description. The procurement package justified the treatment of the contract as an SDVOSB set aside, and identified four SDVOSBs, including Companies K and F, as capable of fulfilling the procurement.

24. On or about January 9, 2008, McMEANS e-mailed Non-Disclosure and Teaming Agreements to C.E. so that C.E. and A.R. could serve as subcontrators on Company K's bid on Project Scorpion.

25. On or about January 9, 2008, C.E. emailed the ghostwritten procurement package described in Paragraph 23 to M.R.

26. On or about January 11, 2008, M.R. submitted the ghostwritten procurement package that he had obtained from C.E. to CBP Procurement Officials and requested approval for funding in the amount of $3 million.

27. On or about January 31, 2008, M.R. informed A.B. that another contracting company had called in to complain about the fact that Project Scorpion was predetermined to be awarded to Company K, and A.B. in turn informed McMEANS. Following this complaint, Project Scorpion was ultimately awarded to a company other than Company K.

### Additional 2008 CBP Procurements

28. On or about January 14, 2008, at A.B.'s request, C.E. e-mailed A.B. an independent government cost estimate for a multi-million dollar CBP contract for IT commodities titled "Gateway BOM v.6 – with pricing."

29. On or about January 14, 2008, A.B. forwarded the independent government cost estimates to McMEANS and wrote "[t]hese are the next big deals for us at CBP. I will start picking off what we want to register and 'Commandeer' these to close."

### 2009 CBP WAN Optimization

30. On or about July 1, 2009, M.R., a contracting officer's technical representative within the Department of Homeland Security, Customs and Border Protection ("CBP"), was informed by a supervisor that CBP had decided to order and implement software for Wide Area Network ("WAN") Optimization. The supervisor instructed M.R. to put together an acquisition package. On or about the same day, M.R. relayed this information to A.B., who by this time was working as a sales representative for Company T.

31. On or about July 17, 2009, A.B. sent an e-mail to McMEANS, disclosing that M.R. had estimated that the WAN Optimization requirement would be "going into the system at $24 million and will be an SDVOSB set aside."

32. On or about July 24, 2009, A.B. sent an e-mail to several senior personnel at Companies K and T, including McMEANS, titled "Putting Together Market Research..." In the

body of the e-mail, A.B. stated in pertinent part, "I need to find 2 other friendly SDVOSB companies with a GSA schedule. I already have [Company F]."

33. On or about August 5, 2009, A.B. sent an e-mail to M.R.'s personal e-mail account and attached Market Research and Acquisition Plan documents for the WAN Optimization procurement. The attached documents contained a justification for awarding WAN Optimization to an SDVOSB company, and identified three companies—Company T, Company F, and an additional SDVOSB company that was willing to submit a loser bid—as capable of fulfilling the procurement.

34. C.E. and A.R. both worked on a service contractor basis within CBP under M.R. and were personally involved in designing and evaluating the WAN Optimization procurement. On or about August 17, 2009, McMEANS agreed to meet the request of C.E. and A.R. and pay 10 percent of Company T's profit on the WAN Optimization contract award to the company owned by C.E. and A.R.

35. On or about September 17, 2009, a CBP procurement officer released a solicitation for bids on the WAN Optimization contract to the companies identified in the WAN Optimization Market Research.

36. On or about September 21, 2009, Company T submitted a bid on the WAN Optimization contract in the amount of $24,099,117.

37. On or about September 21, 2009, Company F and another SDVOSB submitted loser bids on the WAN Optimization contract. Company F's loser bid was in the amount of $26,658,630.39. The other company's loser bid was $29,111,449.95.

38. On or about September 30, 2009, CBP awarded the contract to Company T in the amount of $24,099,117.

39. On or about March 9, 2010, Company T issued a check to the company owned by C.E. and A.R. The check was in the amount of $351,176.60, which represented approximately 10 percent of Company T's margin on the WAN Optimization contract.

### Loser Bids After WAN Optimization

40. On or about August 9, 2010, Company T accidentally won a procurement with the General Services Administration ("GSA") on which it had submitted a loser bid at Company F's request. After the accidental win, McMEANS caused Company T to team up with Company F such that Company F provided the goods at issue to the government even though Company T had won the procurement. McMEANS also caused Company T to provide an additional item at no cost as part of this procurement so that it would be compliant with Company T's GSA schedule requirements.

41. On or about June 27, 2011, McMEANS e-mailed a representative of another contracting company and asked "[a]ny chance you guys can put in a third bid for us?" The employee responded, "Yes sir, please send it over," at which time McMEANS instructed Company T staff to send over a loser bid.

42. On or about March 22, 2012, a member of Company T's inside sales staff complained in writing to McMEANS about the volume of loser bids that Company T was submitting at Company F's request, stating "I do about 4-5 a week for [Company F employee T.F.]."

### Gains from the Conspiracy

43. In total, Companies K and T obtained at least $43,160,010.71 in contracts with the federal government through the loser biding practice and other conspiratorial conduct. Companies K and T made at least $5,205,067.82 in profits on these contracts.

44. The conspiracy also resulted in gains to others, including to Company F and its employees. Company F obtained at least $4,743,554.06 in contracts with the federal government through the loser bid practice, and made at least $497,208.90 in profits on those contracts.

## CONCLUDING STATEMENTS

45. The acts described above were done willfully and knowingly and with the specific intent to violate the law, and not by accident, mistake, inadvertence, or other innocent reason.

46. This Statement of Facts does not contain each and every fact known to the defendant and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement.

47. The defendant, EDWIN KEITH McMEANS, agrees that, in the event he does not follow through with his intention to plead guilty or is plea is rejected by the Court for whatever reason, this Statement of Facts shall be admissible against him as a stipulation of uncontested facts at any trial or other proceeding relating to the matters described herein.

Dana J. Boente
United States Attorney

By: *[signature]*
Kosta S. Stojilkovic
Assistant United States Attorney
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3700
Fax: (703) 299-3981
kosta.stojilkovic@usdoj.gov

Defendant's Stipulation and Signature
After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, EDWIN KEITH McMEANS, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
EDWIN KEITH McMEANS

Defense Counsel's Signature
I am the attorney representing EDWIN KEITH McMEANS. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
James Hundley, Esq.
Counsel for the Defendant