1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF VIRGINIA
2                 ALEXANDRIA DIVISION

3  UNITED STATES OF AMERICA,    )  Case 1:15-cr-00264
                                )
4                 Plaintiff,    )
                                )
5        v.                     )  Alexandria, Virginia
                                )  December 18, 2015
6  EDWIN KEITH McMEANS,         )  9:11 a.m.
                                )
7                 Defendant.    )
   _____)  Pages 1 - 25
8

9                  TRANSCRIPT OF SENTENCING

10         BEFORE THE HONORABLE ANTHONY J. TRENGA

11            UNITED STATES DISTRICT COURT JUDGE

12
   APPEARANCES:
13
   FOR THE PLAINTIFF:
14
        KOSTA S. STOJILKOVIC, ESQUIRE
15      OFFICE OF THE UNITED STATES ATTORNEY
        2100 Jamieson Avenue
16      Alexandria, Virginia  22314
        (703) 299-3700
17
   FOR THE DEFENDANT:
18
        JAMES W. HUNDLEY, ESQUIRE
19      BRIGLIA, HUNDLEY, NUTALL & KAY, PC
        1921 Gallows Road, Suite 750
20      Vienna, Virginia  22182
        (703) 883-0880
21
   THE DEFENDANT, EDWIN KEITH McMEANS, IN PERSON
22

23

24

25     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1          THE CLERK:  Criminal Case 1:15-cr-264, *United*

2  *States of America v. Edwin Keith McMeans.*

3          MR. STOJILKOVIC:  Good morning, Your Honor.

4  Kosta Stojilkovic on behalf of the United States.

5          MR. HUNDLEY:  Good morning, Your Honor.  Jim

6  Hundley on behalf of Keith McMeans, who is present at

7  counsel table.

8          THE COURT:  Good morning.  We're here for

9  sentencing.

10          Mr. Hundley, have you provided a copy of the

11  presentence report and reviewed it with Mr. McMeans?

12          MR. HUNDLEY:  Yes, Your Honor, I have.

13          THE COURT:  Any objections to it?

14          MR. HUNDLEY:  No objections or corrections to

15  the presentence report at this time, Your Honor.

16          THE COURT:  All right.  Thank you.

17          Mr. Stojilkovic, any objections to the

18  presentence report?

19          MR. STOJILKOVIC:  No, Your Honor.

20          THE COURT:  All right.  Does the government

21  want to be heard on the sentencing factors?

22          MR. STOJILKOVIC:  Briefly, Your Honor.  As we

23  state in our position -- and the Court is familiar with

24  this investigation through a number of prior

25  defendants -- what we tried to do here was to come up

1   with a sentencing recommendation, a joint sentencing

2   recommendation that considered the sentences already

3   imposed on other defendants to try to situate this

4   defendant.

5          Just the critical facts in the government's

6   view:  Number one, this defendant was aware and

7   approved at times of the conduct, kind of the full

8   range of the conduct in the scheme, that is, not only

9   the submission of the rigged bids.  He was aware that

10  Codefendant Bilby was drafting internal documents for

11  the government procurement process, that he was

12  obtaining internal documents from the government's

13  side.  And critically, this defendant was aware and, in

14  fact, issued the approval for the 10 percent kickback

15  to Codefendant Ellis.  So those are facts that, in our

16  view, place him closer to Bilby and Ellis than to Flynn

17  and Rivera, the other two defendants who received the

18  lower sentences.

19         At the same time, I would say while this

20  defendant was Bilby's supervisor and while this

21  defendant had an ownership interest in the companies,

22  unlike Defendant Bilby, he was throughout the conduct

23  more passively involved than Bilby was.  He would

24  become involved at times.  He would issue approvals.

25  He was briefed, but he was not involved in a day-to-day

1  or week-to-week basis in all of the conduct like Bilby

2  was.

3          He did make less money than Bilby from the

4  conduct.  As reflected in the forfeiture, Bilby made

5  about a million dollars on a commission basis.  This

6  defendant, based on his ownership interest, made about

7  $320,000, more comparable to what Defendant Ellis made.

8          The final point I would make:  We also did

9  consider -- both Bilby and Ellis ultimately got

10 sentencing reductions for their cooperation.  There is

11 no cooperation aspect to this plea agreement.  We had

12 approached this defendant over two years ago with a

13 plea of cooperation deal.  There was never any real

14 interest on the other side to cooperate, and that's the

15 defendant's decision.  We do believe that there was

16 knowledge of these facts among the other principals of

17 Companies K and T, and that's something we certainly

18 would have wanted to explore.

19         But as we situate this defendant in light of

20 all of those facts, we think a sentence that would be

21 slightly less than what Bilby and Ellis received but

22 more than their ultimate sentence after reduction would

23 be appropriate.  That is why we recommend the 8-month

24 sentence.

25         We also have a consent order of forfeiture

1  that I believe has been signed by the parties.

2          THE COURT:  All right.  Thank you.

3      (Documents are passed up to the Court.)

4          THE COURT:  Mr. Hundley.

5          MR. HUNDLEY:  Yes.  Thank you, Your Honor.

6          Your Honor, before I begin my argument, I did

7  want to introduce to the Court the family members of

8  Mr. McMeans who are here.  His wife, Peri McMeans, is

9  here; his parents, Kerryn and Edwin McMeans; as well as

10 Mrs. McMeans' parents, Shelly and Tom Rockwall

11 (phonetic) presently seated in front.  There are also

12 numerous friends and family here supporting

13 Mr. McMeans.

14         The McMeans also wanted me to thank you for

15 continuing this matter and let you know that their son

16 has fully recovered and is back in school and doing

17 well.

18         Your Honor, Mr. McMeans is the fifth member

19 of this conspiracy to come before this Court.  Your

20 Honor, I do believe, based on my conversations with the

21 government, that he will be the last.

22         I hope that my memo has sufficiently

23 explained Mr. McMeans' role as general manager at

24 ThunderCat and how ThunderCat, as a qualified set-aside

25 company or reseller, conducted its business, and I

1 think, most importantly, how all of those sort of

2 variables and pressures that were at work in the

3 competitive environment that ThunderCat was operating

4 in coalesced to bring Mr. McMeans into this conspiracy.

5 There are a couple of points that the

6 government has raised in their memo, as well as today,

7 that I just wanted to touch on, Your Honor:

8 They have mentioned Mr. McMeans' decision not

9 to cooperate. In the memo, it's mentioned in

10 conjunction with the sentences that the other

11 defendants who did cooperate received, and they

12 received reduced sentences for their cooperation.

13 So to the extent that it's comparing that

14 point, cooperation is a mitigating factor. I think

15 it's a fair point. I believe it's settled matter of

16 law that a defendant's decision not to cooperate is not

17 to be considered by the Court as an aggravating factor.

18 I don't believe the government meant it to be presented

19 to the Court in that way, and I'd certainly ask the

20 Court not to take it that way.

21 Your Honor, there's also a reference in the

22 memo that it was Mr. McMeans who introduced Mr. Bilby

23 to Mr. Flynn in 2007. I don't know the source of that

24 information to the government, but it was not

25 Mr. McMeans who made that introduction. In 2007, Knife

1 Point was just at its very beginning, and Mr. McMeans

2 didn't have any connections with the folks at Four

3 Points, Mr. Flynn's company.  Those contacts belonged

4 to other people in the company.  So it couldn't have

5 been Mr. McMeans who introduced Mr. Bilby.  He didn't

6 even really know Mr. Bilby until 2007.  Mr. Bilby was

7 one of the company's first hires.

8    It's a somewhat small point, but I raise it

9 because I think it's important in determining what's a

10 fair sentence in this case.  I believe Mr. McMeans'

11 lack of knowledge about government contracting when he

12 first began at Knife Point and even at ThunderCat is

13 important in showing how he was drawn into this

14 conspiracy.

15    He didn't originate the third bid, loser bid

16 process.  He didn't encourage Mr. Bilby to do it.  He

17 didn't really even sort of manage in the classical

18 sense.  Mr. Bilby -- he was his supervisor, but

19 Mr. Bilby was brought in because of his expertise in

20 government contracting.  They relied on him for his

21 expertise.  I think that's shown by the fact that

22 Mr. Bilby wouldn't have had a pay structure that would

23 allow him to be paid $1 million to close the WAN

24 optimization deal unless they weren't relying on that

25 expertise to bring them that deal.

1        I think it would be easy to make the mistake

2   that because Mr. McMeans had the title of general

3   manager at ThunderCat, that he was pulling all of the

4   strings and knew everything that was going on at

5   ThunderCat.  But that's not true.  The Court

6   understands that that's not how complex businesses

7   work.  The government has conceded that Mr. McMeans'

8   level of involvement in producing these bids and

9   submitting to the bids was less than others involved in

10  the conspiracy.

11        Mr. McMeans' duties at ThunderCat were really

12  sort of twofold.  He was responsible for managing the

13  daily requirements that are inherent in all businesses,

14  the sort of keep-the-lights-on aspects of the business,

15  payroll, finance, banking, that sort of thing.  And

16  then he was the individual who was charged with

17  obtaining for the company partnerships and registration

18  deals in the private sector with the larger vendors who

19  would want to use ThunderCat to access set-aside

20  contracts and sell their products through ThunderCat,

21  the reseller.

22        He wasn't on the other end of the pipeline,

23  if you will, doing the day-to-day work for the

24  government contracts and bidding.  That wasn't his job.

25  His job was to get the registration deals with the

1  partnerships.

2          But I want to be clear on this, Your Honor.

3  In that role, Mr. McMeans did gradually come to

4  understand the scope and the true nature of these loser

5  bids that were being submitted to the government.  We

6  don't deny that at all.  Initially, he rationalized

7  that these bids were okay because the government,

8  through the price registration programs that the

9  vendors had set up with ThunderCat, was getting the

10 best market price available.  I think the evidence

11 does -- I think it establishes that, that they always

12 got below government cost estimate on these deals.  So

13 he may well have been correct in that rationalization

14 about the lack of a loss to the government.

15          I know in the prior cases there was a good

16 bit of argument about gain for loss and whether or not

17 a loss could be established.  We've accepted that, for

18 purposes of calculating the guidelines, that's the

19 correct methodology.

20          Here's the key point:  Once Mr. McMeans

21 learned the true nature of these loser bids, that they

22 were basically just forgeries, that no due diligence

23 was being done to produce them, he had an obligation to

24 stop them, and he didn't.  He failed.  He allowed them

25 to continue.  He allowed his company and himself to

1 profit from it.  It's a mistake he regrets, and he's

2 going to regret it for the rest of his life.

3         He's accepted responsibility for it.  He's

4 held himself accountable.  He's already begun taking

5 tremendous steps to try to atone for this mistake.

6 After the search warrants were executed, which was back

7 in mid-2012, I believe, he spent an extensive amount of

8 time working at ThunderCat with legal experts who had

9 expertise in compliance to implement at ThunderCat

10 procedures to ensure that this would never happen

11 again.  He didn't want this to ever happen again, and

12 he played a key role in making sure that was the case.

13         When it became clear he was going to be held

14 criminally liable, he didn't try to hide it.  He told

15 his family.  He told his friends.  He told his

16 coworkers what was happening, and he left ThunderCat.

17 He left the company that he had worked so hard to build

18 up.  It was very hard on him.  But it was the right

19 thing to do in the face of this grave mistake that he

20 had made, and he did it.

21         Your Honor, I think if there's one point that

22 I can make with the Court today, I hope it's this:

23 That Keith McMeans is someone who has always strived to

24 do the right thing.  Now, he failed in this instance.

25 He failed at ThunderCat, and that's why he's here.  But

1  by being here today, he is doing the right thing. He's

2  accepted responsibility. He's ready to be held

3  accountable.

4         And, Your Honor, as you can see from all of

5  the really -- some of them are really beautiful letters

6  that were submitted to the Court from his family and

7  his friends. He's an individual that has the personal

8  character and he's got the support in the community to

9  handle the consequences of his conduct in this case, to

10  pay his debt to society, put it behind him, and then

11  continue doing the right productive things that he's

12  always done.

13         He's someone who has always been extremely

14  supportive of his family. He's been active in his

15  community through coaching and through some really

16  extraordinary acts of charity to help other people who

17  aren't as fortunate as him.

18         He understands his crime. He's accepted it.

19  He's really -- he's devastated by it. And as I said,

20  he's ready to atone for it and to put it behind him and

21  return to a positive, productive life that he's always

22  led.

23         Your Honor, I would ask the Court to accept

24  the parties' joint recommendations in this case and not

25  to impose more than the 8-month sentence. I think

1   under the analysis of the factors in Section 3553 that

2   is a fair and just and sufficient sentence in this

3   case.

4           Your Honor, Mr. McMeans has today the

5   forfeiture check to pay the forfeiture amount in full.

6   I would argue to the Court that given that fact, no

7   fine is necessary in this case.  That forfeiture

8   addresses any concerns that a fine would address.

9           Your Honor, I'd ask the Court to recommend

10  that Mr. McMeans serve any sentence of incarceration at

11  the federal facility in Morgantown, West Virginia.  I

12  would ask -- and I don't believe the government has any

13  objection to this, and this was done in all of the

14  other coconspirators' cases -- that he be continued on

15  bond until he's ordered by the Bureau of Prisons to

16  report to serve any sentence.

17          Thank you.

18          THE COURT:  Thank you, Mr. Hundley.

19          Mr. McMeans, you have the opportunity to

20  address the Court before it imposes sentence if you'd

21  like to say anything, sir.

22          THE DEFENDANT:  Yes.  First, Your Honor,

23  thank you for giving me the opportunity to speak.  I'll

24  keep my comments brief, but please know that this has

25  been a long, painful, and confusing process.

1          First, I'd like to apologize to you, to the

2     Court, and to the justice system for ever having to

3     look at me and at this case.  It never should have

4     happened.  There were some lack of judgments and

5     mistakes made by me.

6          On top of that, I would like to thank my

7     family and friends for being here today.  My friends

8     have been incredibly supportive of me throughout this

9     process.  They've given me -- whether it's a shoulder

10    to cry on or talk to or just a way to have fun.

11         And then specifically my family.  This has

12    been almost three years, and I know it's been really

13    tough, especially on my boys and my wife.  But I know

14    that God will grant us a brighter day.  That's what

15    we'll wait for.

16         Judge Trenga, I made some mistakes, and I've

17    grown to realize that those mistakes are undeniable,

18    not malicious but undeniable.  I've come to realize the

19    gravity of those mistakes, and I don't believe that

20    anything like this will ever happen again from me.

21         So with that said, I understand that I will

22    be punished.  I'm at peace and accepting of whatever

23    you see fit.

24         THE COURT:  All right.

25         THE DEFENDANT:  Thank you.

1          THE COURT:  If you'll have a seat, sir.

2          This case is before the Court for sentencing

3    in the case of *United States v. Edwin Keith McMeans*

4    with respect to his conviction for conspiracy to commit

5    wire fraud and major government fraud, in violation of

6    Title 18, United States Code, Section 371, which is a

7    Class D felony punishable by a term of up to 5 years in

8    prison, a fine of up to $250,000 or twice the gross

9    gain or loss, full restitution, a $100 special

10   assessment, and up to 3 years of supervised release.

11         This 47-year-old defendant was involved in a

12   procurement fraud scheme.  On September 9, 2015, he

13   waived indictment and, pursuant to a plea agreement,

14   entered a plea of guilty to a one-count criminal

15   information.  He was released on personal recognizance

16   bond pending sentencing with conditions, which he has

17   fully complied with.

18         The Court has reviewed the guideline sentence

19   as it applies to this defendant and this offense.  In

20   that regard, the base level is 6 appropriately

21   increased by 18 levels to reflect a loss amount using a

22   gain as proxy of more than $3.5 million.  It's also

23   appropriately increased by 3 levels because the

24   defendant was a manager or supervisor of the criminal

25   activity involving five or more participants resulting

in a base offense level of 27. The defendant has
accepted responsibility and, therefore, is entitled to
a 2-level reduction. The government has also moved for
an additional 1 level based on that acceptance, which
the Court grants, resulting in an overall offense level
of 24.

This is essentially the defendant's first
offense. He is, therefore, in a criminal history I.
The guideline sentence for his offense level and
criminal history category is 51 to 60 months.
Probation is authorized under the statute but not the
guidelines. Supervised release is recommended of 1 to
3 years with a fine of $10,000 up to $11 million with a
special assessment of $100.

The Court has reviewed the presentence report
and the extensive information it's received together
with the many letters from family and friends
concerning Mr. McMeans.

As to the nature and seriousness of this
offense, the Court has placed on the record the nature
of the scheme involved in this conspiracy in connection
with the sentencings of others involved, including
Anthony Bilby, Thomas Flynn, Miguel Rivera, and
Chancellor Ellis, and those portions of the transcript
pertaining to those sentencings is incorporated into

this hearing by reference. The Court is not going to
repeat what was laid out at length concerning the
details of the procurement scheme that this defendant
was involved in.

By way of brief summary, the defendant was a
principal and co-owner of two government contracting
companies, known as Companies K and T, which provided
to the government information technology services and
products. Both companies were self-certified
Service-Disabled Veteran-Owned Small Businesses that
enjoyed certain advantages and preferential treatment
on certain government procurements, which nevertheless
were required to be based on multiple competing bids.

Both companies in that capacity presented
bids for contracts to the federal government in which
the companies provided a Certificate of Independent
Pricing which represented that the offered prices had
been arrived at independently for the purposes of
restricting any competition, any consultation,
communication, or agreement with any other offeror or
competitor pertaining to prices or the intention to
submit an offer or the method or factors used to
calculate prices offered.

As a general manager of Company T, this
defendant authorized those certificates of independent

1   price determination to be submitted to the government

2   on behalf of that company.

3           Beginning in approximately March 2007 and

4   continuing until approximately November 2012, this

5   defendant conspired with others to obtain federal

6   government contracts through false pretenses and

7   representations.  Specifically, this defendant engaged

8   in a number of unlawful procurement practices,

9   including first engaging in what is known as loser bid

10  or courtesy bid practices whereby this defendant

11  submitted and allowed employees of Companies K and T to

12  submit fraudulent bids provided to Company T by nominal

13  competitors, such as Company F, that were higher than

14  the bids submitted by Company T in order to create the

15  illusion of competition.

16          Secondly, he caused Company T to make

17  unlawful payments, including a $359,000 kickback on one

18  contract to persons who were working within the

19  government and who were in a position to influence the

20  award of contracts by allowing a Company K and T

21  employee, namely Anthony Bilby, to draft portions of

22  internal government procurement documents relating to

23  contracts that the Companies K and T intended to bid

24  on.  Those activities clearly increased the likelihood

25  of winning those contracts without any actual

1 competition.

2        Through this fraudulent conduct and

3 participation in the conspiracy, Companies K and T

4 obtained at least $43 million in contracts with the

5 federal government, including one particular contract

6 of approximately $24 million, known as the Wide Area

7 Network or WAN optimization contract, on which

8 Companies T and K made at least $5.2 million in

9 profits.  Company F obtained a total of approximately

10 $4.7 million in federal contracts on which it realized

11 approximately a profit of $500,000.  This particular

12 defendant realized under those contracts directly

13 approximately $320,000.

14        The Court has considered other aspects of the

15 procurements at issue in this scheme, including the

16 nature of the procurement process, the effect on the

17 procurement process of registered resellers, the

18 government's long-standing interest in its solicitation

19 of Company T's participation, and the use of its

20 technology it could supply and what has been described

21 as the government's long-standing commitment to that

22 technology independent of any wrongdoing.

23        While it may be the case that even in the

24 absence of wrongdoing, the contracts would have been

25 awarded as they were, the technology that Company T

offered was just one of several technologies that were
being tested and considered.  Company T was involved in
activities that improperly steered the company to
Company T, including providing the technical
specifications, providing market research that would
justify a set-aside and effectively making Company T
the only real bidder, and also providing criticisms of
competing technologies to the technical representatives
to use to advance his company's technology while the
technical representative was soliciting and receiving
financial benefits from the company.

In short, this defendant played a leadership
role in facilitating conduct that fundamentally
corrupted the federal procurement process, and in
effect, through his and others efforts, including the
use of inside information, ghostwriting, and bribery,
Company T was able to substantially corrupt the
procurement process itself.  It's impossible to
attribute these contract awards to anything other than
the corruption of the process that occurred.

Against this background, the Court has
reviewed the guideline sentence and the extent to which
the guideline sentence appropriately reflects the
sentencing objectives.  In that regard, the Court has
considered, among other factors, the noneconomic impact

on the government, this defendant's specific role in
the conspiracy relative to others, the benefits he
derived from his involvement, his overall degree of
criminal culpability, and the public interest.

As I mentioned earlier, the guideline
sentence is driven by a loss calculation that is based
on a gain that has, in this case, no demonstrable
relationship to any actual loss that the government has
sustained.  For these reasons, the Court is forced to
assess, based on other factors, the extent to which
this defendant's conduct has, in fact, imposed the kind
of tangible and intangible harm that would justify a
guideline sentence at the range calculated by the
guidelines based on gain.

For that purpose, the Court has considered
the defendant's conduct in comparison to the conduct in
other fraud cases that have resulted in similar
guideline sentences based on actual or intended losses
associated with a defendant's conduct.

As the Court observed in connection with the
sentencings involved with other defendants in this
conspiracy, this crime does not involve the kind of
substantial outright theft or fraudulent inducement
that is often associated with the guideline sentence in
this case.  Rather, as everyone seems to agree, this

1 crime is what we've been referring to as a process

2 crime. But that label should not imply a nonserious

3 offense. It requires that its seriousness be evaluated

4 based on a variety of factors, which includes not only

5 the extent to which the procurement process was

6 compromised and corrupted, but also the extent to which

7 that compromised process resulted in other harm, such

8 as inferior products or services or price gouging.

9         In that regard, there is no contention or

10 evidence that the government did not receive what it

11 contracted for, that its overall pricing, while perhaps

12 affected by the fraud, was commercially unreasonable

13 for the products and services delivered or greater than

14 what the government itself had determined was a fair

15 price. Nor is this a case where the defendant thought

16 that the products and services provided were defective

17 or inferior in some way.

18         It also does not involve a defendant who

19 initially organized the fraud, but rather one who upon

20 discovering the fraud essentially lost his moral

21 compass and pursued the financial advantages that the

22 fraud offered.

23         The Court has also considered the defendant's

24 personal history and characteristics. In that regard,

25 the defendant is married with two children and has what

appears to be an exceptionally supportive and extended family.  There's no history of any substance abuse or mental health issues, no violence or any evidence of intimidation in this case.  I've reviewed the many letters from family and friends and colleagues who speak to the defendant's good qualities and the contributions that he's made to their lives and the community.

This is the defendant's first real involvement in the criminal justice system.  By all accounts, but for this offense he has lived a law-abiding, purposeful, and contributing life.

Against this background, the Court has considered the public interest, essentially and particularly the need for general, as well as specific deterrence, and the respect for law, particularly whereas here the fraudulent conduct extended over a substantial period of time.  The kinds of conduct represented by defendant's scheme not only undermined the public confidence in the government procurements but also lead to what was in effect the bribery of government employees and others in a position to influence the award of the contract and those person's breach of the public trust placed in them.

Nevertheless, the Court has considered also

1　the public interest in fashioning a sentence that would

2　allow this essentially first-time offender to return to

3　the community and his family within a reasonable period

4　of time, which the Court believes is possible, in order

5　to resume a productive and law-abiding life.

6　　　　　The risk of recidivism appears low, and for

7　that purpose, the Court has considered the extent to

8　which alternative sentences, such as supervised

9　release, can adequately satisfy the sentencing

10　objectives.

11　　　　　The Court has also considered in detail the

12　need to avoid unwarranted sentencing disparities, and

13　the Court has considered sentences issued in this court

14　in procurement fraud cases and specifically to the

15　other defendants and the extent to which those

16　sentences were affected by factors not present with

17　respect to this defendant.

18　　　　　The Court has given substantial consideration

19　to the government's recommendation as a joint

20　recommendation and the judgments that are embedded in

21　it.

22　　　　　Finally, the Court has considered this

23　defendant's acceptance of responsibility.

24　　　　　The Court is in a position to impose sentence

25　at this time.

1    Mr. McMeans, would you come to the podium,
2 please.

3    Mr. McMeans, it will be the sentence of this
4 Court that you be committed to the Bureau of Prisons
5 for a period of 8 months, following which you'll be
6 placed on supervised release for a period of 1 year
7 with the standard terms and conditions.

8    The Court is also going to impose a fine in
9 the amount of $10,000, which will be due and payable
10 immediately.  To the extent not payable in full, upon
11 your release from prison, it will be paid on a monthly
12 basis in equal monthly amounts of not less than $1,000
13 until paid.  All moneys received from any tax refunds,
14 lottery winnings, or other anticipated or unexpected
15 financial gains will be used towards the payment of
16 that fine.

17    The Court will impose a $100 special
18 assessment due and payable immediately as well.

19    The Court will recommend also to the Bureau
20 of Prisons that, if available and appropriate, you be
21 placed at the Morgantown facility.

22    The Court will allow you to voluntarily
23 surrender at a time and place to be provided to you
24 through Pretrial Services and Probation under whose
25 supervision you will remain until you report to the

1   Bureau of Prisons.

2           That will be the sentence of the Court.

3           Is there anything further?

4           MR. STOJILKOVIC:  Your Honor, the forfeiture

5   order.

6           THE COURT:  Yes.  The Court has signed the

7   forfeiture order.

8           All right.  Anything further?

9           MR. STOJILKOVIC:  No, Your Honor.

10          MR. HUNDLEY:  No, Your Honor.  Thank you.

11          THE COURT:  All right.  Counsel and the

12  defendant are excused.

13          -----------------------------------
                        Time:  9:41 a.m.
14

15

16

17

18

19

20

21
        I certify that the foregoing is a true and
22
    accurate transcription of my stenographic notes.
23

24
                              _____
                                      /s/
25                            Rhonda F. Montgomery, CCR, RPR